C. Edward Murray et al., respondents,

*v.*

William H. Skirm, Jr., appellant.

[Submitted July 12th, 1907.   Decided April 3d, 1908.]

A court of equity, in the exercise of a sound discretion, will direct one judgment to be set off against another whenever such relief does not run counter to any established principle of law or equity.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bergen, who filed the following opinion:

"The complainants allege that, September 15th, 1903, the complainant Murray recovered a judgment in the supreme court of this state against the defendant for $3,341.74, under which the sheriff levied on two hundred and forty-one shares of the capital stock of the Empire Rubber Manufacturing Company, which was appraised by the sheriff and persons selected for that purpose by him, at $100 per share, and after setting off to the defendant two shares to satisfy the exemption allowed him as a debtor having a family, the residue was, on October 11th, 1903, sold by the sheriff at public auction for $50; that there yet remains due on said judgment $3,303.99; that October 12th, 1903, said judgment was assigned by Murray to a third person, and by him immediately reassigned to the complainants; that October 15th, 1903, the defendant recovered a judgment in the said court against the complainants for $4,175.32. The prayer of the bill is that the judgment so assigned be set off against the judgment recovered by the defendant against the complainants' judgment, so far as it will extend.

"The defendant, answering the bill, admits all the material allegations contained therein, but in an answer by way of cross-bill exhibited against the complainants, and also against A. Boyd Cornell and the Mechanics National Bank of Trenton, charges

that on July 9th, 1902, the defendant loaned to the complainants the sum of money for which he afterwards recovered his judgment against them; that when he brought his suit for the recovery thereof the complainants filed a plea of general issue, which they afterwards relinquished, and charges that the plea was filed for the sole purpose of preventing the recovery of the judgment until the complainants had recovered their judgment against the defendant, and sold under it the property of the defendant, as hereinafter set out; that the foundation of the complainants' judgment was a note made by the defendant, and endorsed as an accommodation by Murray, to the Mechanics National Bank in Trenton, and to secure the payment of which the defendant pledged as collateral with said bank fifty shares of the capital stock of said rubber company; that when said note matured, Murray and Baker, having refused to pay their debt to the defendant, he was unable to provide for its payment, whereupon the bank caused said stock to be sold at public auction on August 20th, 1903, where it was struck off and sold to A. Boyd Cornell for $350, Cornell being the brother-in-law of Murray; that on the sixteenth day of October, 1903, the defendant tendered to Murray the principal and interest due upon the judgment against him, the defendant, demanding of Murray the fifty shares sold to Cornell, which tender Murray declined. The prayer of the cross-bill is that the sale of the fifty shares of stock may be decreed to have been fraudulently made, and that the same be set aside, and that a similar decree be made with reference to the sale of the two hundred and thirty-nine shares sold under the judgment against the defendant. No evidence was introduced with reference to the sale of the two hundred and thirty-nine shares, so that the further consideration of that question may be dismissed. With regard to the fifty shares, the evidence shows that the defendant was unable to pay his loan to the Mechanics National Bank at the maturity of his note, upon which Murray was liable as endorser, and to secure which the fifty shares of stock had been deposited, and that this inability was caused by the neglect or refusal of the complainants to pay to him a much larger sum, for which he held their past-due obligations, and it further appears that the defendant tendered

to Murray all that he had been required to pay in satisfaction of his liability as endorser.

"After reading the evidence, and giving this matter most careful consideration, I do not find myself able to justify the claim of the defendant. The bill of complaint is in the ordinary form,·asking for an equitable set-off, the material facts are all admitted, and the only defence offered is by way of cross-bill, asking this court to refuse the ordinary relief in such cases because the stock held by the bank as collateral was sold by it at public auction to Cornell. There is not a particle of evidence justifying the slightest criticism of the conduct of the bank; the defendant was notified by the officers of the bank more than once that if he did not provide for his obligations the stock would be offered for sale. He paid no attention to these notices, at least so far as the evidence discloses, and the bank, after fully advertising the sale, had it sold in a public manner at a place where such sales usually take place. The purchaser of this stock was a brother-in-law of Murray, and immediately upon the purchase and transfer pledged it for a loan of $3,000. at the same bank. Of this money $350 was used to pay the purchase price, the balance, $2,650, was loaned to Murray, and by him used, with other moneys, to pay the balance due on the endorsed paper. Under this evidence I am asked to declare that Cornell is not the owner of this stock; that he bought it in trust for Murray, and that the whole proceedings was a scheme to cheat and defraud the defendant. If the proceedings complained of were corruptly instituted to deprive the defendant of his property, the bank must have been a party to it, and, as I have said, there is no evidence to sustain that allegation. Nor is there any evidence that Cornell is not the *bona fide* holder and owner of the stock, and while some of the circumstances may justify the suspicion of a conspiracy to defraud, there is no proof of any fraud. On the argument, it was earnestly insisted that this sale was for a price so grossly inadequate that a court of conscience ought to set it aside for that reason, but I am unable to say that the price for which this stock was sold was so grossly inadequate. It was the stock of an industrial company, and its market value was an ·uncertain quantity. This stock was sold on the 20th

day of August, 1902, and on the 15th day of September following two hundred and thirty-nine shares of the stock of the company was sold at public auction for $50, the defendant apparently taking no interest in protecting it, or at least not enough to attend a public sale, and bid for it. In addition to what I have said I am of the opinion that the affirmative relief sought by the defendant cannot be allowed under these pleadings. The bill seeks to set off the two judgments. The cross-bill does not deny the validity of the complainants' judgment, but seeks to have set aside, first, a sale made under the judgment, and secondly, a sale of securities deposited as collateral to a loan made to the defendant, the deposit being with, and the sale made by, a corporation in no way related to any of the parties, and in my judgment, the relief sought should have been the subject of an original bill. However, the determination of this case does not depend on the question of pleadings, as I shall advise a decree for the complainants upon the merits, and dismiss the cross-bill."

*Mr. John H. Backes,* for the appellant.

*Mr. Edwin Robert Walker,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The bill in this case was filed by Murray and Baker to have a judgment that they held against William H. Skirm set off against a judgment that he held against them. The controversy arises over the case made by Skirm under a cross-bill. The nature of the controversy and the facts involved are fully set forth in the conclusions of the learned vice-chancellor who heard the cause. Upon the issue tried before him the material facts found are—*first,* that the conduct of the bank in selling the shares of stock pledged to it as collateral by Skirm is not open to adverse criticism; *second,* that Skirm, in the face of repeated notices from the bank, abandoned his collateral to be sold at public auction; *third,* that there was no proof of fraud on the part of Cornell, who was the highest bidder at the sale, or on the part

of Murray; *fourth,* that Cornell is a *bona fide* purchaser and owner of the stock; *fifth,* that in view of Skirm's conduct with respect to his collateral the discrepancy, if any, between the amount at which it sold and the problematical value of the stock, was not a ground for nullifying a sale in other respects valid; and *lastly,* that no established principle of equity is contravened by granting the offset sought by the bill. The learned vice-chancellor also intimated, indeed he expressed the opinion, that the relief sought by the defendant, Skirm, was not the proper subject of a cross-bill. In this we think he was mistaken. In granting or denying applications to have one judgment set off against another courts of equity and courts of law acting upon equitable principles, exercise what is called in the books a discretion; but the discretion thus exercised is not an untrammeled one; it is conditioned upon, if not actually circumscribed by, established principles of equity. Subject, therefore, to the determination of matters that fall within these established principles, the right of offset is as determinate as is that of specific performance, of which it was said in *Page* v. *Martin, 46 N. J. Eq.* (*1 Dick.*) *585,* that while such relief rested in discretion, it was as much a matter of course for courts of equity in a proper case to decree the specific performance of a contract as it was for courts of law to give damages for its breach. It is in this sense, and not in that of an arbitrary volition, that the term is used in our cases touching the offsetting of judgments.

Observing this distinction the rule is correctly stated in a leading work of reference to be that:

"A party applying to a court of equity to have one judgment set off against another is entitled to such relief under proper circumstances as a matter of right. It is not a matter of discretion, but the court is bound to determine the rights of the parties according to established principles of equity." *25 Am. & Eng. Encycl. L. 614.*

It follows therefore that any state of facts that, according to the established principles of equity, would lead to the denial of the set-off sought by a complainant is a proper matter of defence, the exhibition of which by way of a cross-bill is not subject to justifiable criticism. In every such case, and hence in the present case, the substantial and controlling question is whether

the facts proved under such pleading invoke the application of *any* established principle of equity that would be violated by granting the set-off that is sought.

Upon the facts found by the learned vice-chancellor in the present case he decided that no such principle intervened to prevent the granting of the set-off sought by the bill, and it must be admitted upon all sides that on the facts thus found such decision must indubitably follow. The appellant has, however, brought the entire case into this court for review, both as to the law and the facts upon "the points upon which he means to rely." (*Court Rule No. 19.*) If, therefore, on any point thus relied upon, the appellant convinces us that the testimony taken in the court below established any state of facts calling for the application of any recognized principle of equity that is violated by the decree, he is entitled to have such decree reversed. The points relied upon by the appellant to this end will therefore be considered in the order of his brief, the cause having been argued on briefs.

The first point is that "the pledgee cannot purchase at his own sale." This assumes, at the outset, a matter of fact upon which the finding of the court below is directly to the contrary, viz., that Cornell was acting not for himself but for Murray. "I am asked," said the vice-chancellor, in reviewing the evidence, "to declare that Cornell is not the owner of this stock; that he bought it in trust for Murray;" to which his answer was that there is not "any evidence that Cornell is not the *bona fide* holder and owner of the stock," and indeed unless surmises and suspicions are to be substituted for proof this finding of the vice-chancellor is unassailable. If, however, it be admitted that the identity of Cornell is merged in that of Murray, we are unable to see the relevancy of the point taken unless Murray be held also to have absorbed the bank, otherwise he was in no sense the "pledgee" and the sale by the bank was in no sense "his sale." But all the evidence is that the pledge was to the bank and that the sale was made by the bank; indeed, it could have been made by no one else. That the bank was not even induced by Murray or by anyone else to make the sale is testified to categorically by Governor Stokes, the president of the bank. The cases cited

under this point to the effect that a pledgee cannot buy at his own sale are lacking in any element of pertinency to the admitted and uncontroverted facts of the present case.

The second point relied upon for reversal is "the securities were not sold as a separate lot." As the appellant never had, and is not now seeking to have, the sale set aside, I do not feel justified in taking up time over this point.

The third and last point taken in the brief is that "the purchase price was grossly inadequate."

In so far as this contention seeks to reverse the finding of fact of the court below (bearing in mind that this is not an application to have the sale set aside or its confirmation denied), we are not inclined to accede to it.

If, in the absence of fraud, it be admitted that the question of the value of the stock is at all relevant to the present controversy it must also be admitted that strictly speaking the market value of the stock was not proved. In lieu of market value, testimony was offered to show its intrinsic value by book valuations spread on the minutes of the company by reports of auditors and by the declarations of dividends. It was also claimed as an admission *in pais* that the price paid for stock in order to secure control of the company was some evidence of its worth, and it was also insisted that the face value of the stock, *i. e.*, its par value, was proof of its market value. As opposed to this line of proof stood the testimony as to the gradual reduction of dividends and the actual recall of the dividend last declared because of the condition of the company's affairs and also the circumstance that the attendance and competition or the lack of it at a local sale of the stock of a local concern were some indication of its reputed value. The vice-chancellor properly declined to take par value as the equivalent of market value and he also rightly recognized that the price paid for stock to get a controlling interest was not a reliable criterion of the market value of the outstanding minority shares. He also took into consideration and gave weight to the admitted fact that Mr. Skirm, who was intimately acquainted with the state of the company's affairs, ignored the repeated notices of the bank that his stock was to be put up at public auction and apparently took no steps whatso-

ever indicative of his faith in its selling value. Other circumstances recited by the vice-chancellor are to the same effect, touching the appellant's attitude toward the stock pledged to the bank and toward a much larger block sold at about the same time. On the question of the problematical value of the appellant's stock, his own conduct, as adduced by him as a witness before the vice-chancellor, was certainly entitled to weight.

Whatever surmises may be indulged in as matters of conjecture, it cannot be said that we are constrained, by the testimony, to the conclusion that the vice-chancellor erred in dealing with this branch of the case, even if the matter be deemed pertinent to any point raised by the appellant, in view of his reiterated assertion of the propriety of the action of the bank in making sale of his stock. "We repeat," he says in his brief, "that no fraud is charged against the bank," and again, "Nothing is sought against the bank." Assuming, therefore, as we must, that the sale was lawful and proper, that it was rightly made and was never objected to or sought to be set aside, on what principle of law or equity can it now be collaterally attacked, in the absence of fraud, even if it be admitted that the highest bidder got the stock for less than its intrinsic value? I confess that I know of none and certainly none is suggested by the appellant. Apparently, moreover, the effort is not even to set aside the sale or to impugn its validity; on the contrary, as I understand it, the sale is to stand and the successful bidder is to be compelled, because of some supposed equity, to increase the amount of his bid until it equals, what sum? The market value of the stock, its book value, its intrinsic value, the total debt for which the stock was pledged, or some other indeterminate sum? To whom, moreover, is this posthumous increase to be paid? To the bank which held and sold the pledge, or to the parties to the note to pay which the stock was sold? And if to the parties, why to Skirm rather than to Murray, who, as the matter stands, having paid the note is the only one immediately injured by the price brought by the collateral? The appellant directs us to no authority of law or principle of equity by force of which a sale, valid when made and never contested, can, in the absence of fraud, be afterwards collaterally attacked and in effect nullified; and upon the

question of fraud the determination of the court below is not
even pointed out as a matter for our review, and if it were, we
could not, upon the testimony, say that the vice-chancellor was
in the wrong.

Our conclusion is that upon none of the points relied on has
the appellant satisfied us of the errancy of the decree from which
he has appealed, which consequently must be affirmed.

Although no such point is made by the appellant, the question
has nevertheless been mooted whether the circumstance that at
the time of the sale of Skirm's stock, Murray and Baker were
in his debt to an amount in excess of the debt for which the stock
was held as collateral, prevented them from buying at the sale
saving as his trustees or imposed upon them the duty of protect-
ing their creditor's collateral by bidding it up to the limit of the
debt for which it was sold or to some other sum based on its
actual value; in fine, whether the complainant's indebtedness to
Skirm makes them, in equity, his indemnificators as to the differ-
ence between the amount for which the stock sold and the
amount of the debt for which it was pledged. If the case had
been tried or argued upon any such theory the answer, I appre-
hend, would be that the proposition thus advanced rests funda-
mentally upon the mistaken assumption that the failure to pay
a legal debt makes the debtor in equity the indemnificator of his
creditor against losses resulting from such non-payment. In
view of the millions of instances in which debts have not been
punctually paid, the circumstance that our attention can be
directed to no case in which such legal defaults were visited in
equity with other than their legal incidents, is doubtlessly due to
the universal acceptance of the doctrine that where the law pre-
scribes a legal measure of damage for the breach of a legal con-
tract the parties are deemed to have contracted with reference to
such measure of damage and courts of equity are bound to so
regard their undertaking.

*Marsden* v. *White, 71 N. J. Eq. (1 Buch.) 224,* in this court,
is a decision in point. In that cause the effort was made to
build up an equity upon the breach of a legal covenant. In de-
ciding against the existence of such an equity it was said, in the
opinion : "The law prescribes just what one party may recover

from the other for the breach of these covenants and this measure of redress by legal intendment forms part of the contract of the parties so that the mere existence of such a covenant implies that the parties have agreed with each other the one to accord and the other to, accept upon the happening of a certain event a known measure of damages. * * * That the court of chancery is bound by the legal rule thus established, at least in the opinion of Vice-Chancellor Van Fleet, is shown in *Post* v. *Sliger, 29 N. J. Eq. (2 Stew.) 554,* where he said: 'Its breach was coeval with its existence and the complainant's right accrued as soon as the covenant was made. His damages were certain and fixed, being limited inflexibly to the consideration paid and interest.' "

Equity, therefore, even regarded as a general "avenger of wrongs," draws the line where purely legal rules control and also it may be added where relief from the operation of such rules is sought upon benevolent or ethical considerations. Under this latter head, Chief-Justice Beasley, in the case of *Davis* v. *Flagg,* refused to give the sanction of this court to the doctrine that a legal right would not be enforced by the court of chancery "if the motive leading to the acquisition of such right has been immoral or otherwise censurable," saying that "the adoption of such rule would be, as it would seem, quite at variance with some of the most primary principles of our system of jurisprudence," and that "the abstract precepts of the moral code, disconnected from property and the rights of persons, are neither enforced nor noticed by courts of law or by courts of equity." *35 N. J. Eq. (8 Stew.) 491, 495.*

The mooted matter need not, however, be further pursued as the questions presented by this appeal have been fully considered and disposed of. The decree of the court below is affirmed.

*For affirmance*—The Chief-Justice, Garrison, Trenchard, Bogert, Green, Gray, Dill—7.

*For reversal*—The Chancellor, Swayze, Reed, Vredenburgh—4.